## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

Adam Hedrick,

        Plaintiff,

v.

Experian Information Solutions, Inc.,
Trans Union LLC, and Equifax
Information Services, LLC,

        Defendants.

**Case No.:**

**COMPLAINT AND DEMAND FOR
JURY TRIAL**

Adam Hedrick ("Plaintiff" or "Mr. Hedrick"), by and through the undersigned counsel,
brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax");
Experian Information Solutions, Inc. ("Experian"); and Trans Union, LLC ("Trans Union")
(collectively, the "Credit Bureau Defendants" or "Defendants"); and states as follows:

### INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the
accumulation and processing of data concerning individual American consumers. Data
technology, whether it is used by businesses, banks, the Internal Revenue Service or other
institutions, allows information concerning individual consumers to flow instantaneously to
requesting parties. Such timely information is intended to lead to faster and better decision-making
by its recipients and, in theory, all of society should ultimately benefit from the resulting
convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and
subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage,

1

both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

[W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.      In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.      The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

3

11.     Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors and employers that Plaintiff owed an unpaid debt and failed to make timely payments on his obligation.

12.     Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

14.     Adam Hedrick ("Plaintiff" or "Mr. Hedrick") is a natural person residing in Hermitage, Tennessee, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

15.     Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Tennessee, including within this District. Equifax can be served through its registered agent, Corporation Service Company located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

16.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating

information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

17.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 475 Anton Boulevard, Costa Mesa, California 92626, and is authorized to do business in the State of Tennessee, including within this District.

18.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

19.    Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661, and is authorized to do business in the State of Tennessee, including within this District. Trans Union can be served through its registered agent, Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

20.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

5

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

23.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

24.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

25.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

26.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

6

27.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## Factual Background

28.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

29.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

30.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

31.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

32.     The Credit Bureau Defendants' consumer reports generally contain the following information:

> (a)     Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

7

(b)     Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)     Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)     Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

33.     The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

34.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

35.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

36.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

37.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

8

38. The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

39. The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

40. DTI compares the total amount a consumer owes to the total amount a consumer earns.

41. The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

42. The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

43. The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

44. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

45. Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures. Specifically, the Credit Bureau Defendants are on notice that

their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

46.     The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

### Plaintiff Orders a Ring from Kay Jewelers

47.     On or about June 9, 2022, Plaintiff ordered a ring (the "Ring") from Kay Jewelers and used his Kay Jewelers credit card to place the order.

48.     Comenity Bank is the issuer of Plaintiff's Kay Jewelers credit card.

49.     Shortly thereafter, on or about June 16, 2022, Plaintiff had a change of plans and canceled the Ring order with Kay Jewelers.

50.     That same day, Plaintiff received a confirmation email from Kay Jewelers stating that the order was cancelled, and his refund would be processed within 5-7 business days.

### Plaintiff Receives a Bill from Comenity Bank

51.     In or around July 2022, Plaintiff received a billing statement (the "Bill") from Comenity Bank.  The charge for the Ring was in the statement and had not been reversed.

52.     Plaintiff was confused when he received the Bill as he'd cancelled his order for the Ring and had received confirmation of the cancellation.

### Plaintiff Contacts Comenity Bank and Key Jewelers

53.     Shortly after receiving the Bill, Plaintiff contacted Comenity Bank and Kay Jewelers to resolve the issue.

10

54. Plaintiff was informed by the Kay Jewelers and Comenity Bank representatives that Plaintiff had received the Bill due to a clerical error. The representatives further assured Plaintiff that they would investigate and resolve the issue.

55. The representatives also assured Plaintiff his Plaintiff's Comenity Bank/Kay Jewelers Account, Account No. 778850XXXXXXXXXX (the "Account"), would not be reported as delinquent while it was under investigation.

56. On or about September 22, 2022, Plaintiff received a letter from Comenity Bank, dated September 18, 2022, stating that it was investigating Plaintiff's claim. Plaintiff was further advised the investigation would be completed in approximately 90 days (about 3 months).

57. In or around December 2022, approximately 90-days after speaking with the Kay Jewelers and Comenity Bank representatives, Plaintiff reached out for a second time as he was still receiving billing statements for payment of the Ring.

58. The representatives again assured Plaintiff the issue would be resolved; that he did not owe money for the Ring; and had nothing to worry about.

### The Credit Bureau Defendants Report Inaccurate Information on Plaintiff's Credit Reports

59. On or about January 15, 2023, Plaintiff received a notification from Credit Sesame that his credit score had dropped approximately 90 points.

60. On or about February 2, 2023, Plaintiff requested his consumer files from the Credit Bureau Defendants on annualcreditreport.com, to determine what caused his score to drop so dramatically.

61. Upon reviewing his credit files, Plaintiff discovered that the Credit Bureau Defendants were reporting the Account as delinquent.

62.     Specifically, the Credit Bureau Defendants each reported the Account with an owed balance of $1,843. The Credit Bureau Defendants also reported the Account as $130 past due as of January 2023.

63.     Defendants Experian and Trans Union each reported the Account as 30 days late.

64.     Defendant Equifax reported the Account Status as "Not more than two payments past due".

65.     Plaintiff was shocked and confused when he saw this reporting as the Comenity Bank and Kay Jeweler representatives assured him that the issue regarding the Ring was going to be fixed.

### Plaintiff's First Dispute to Defendant Equifax and Defendant Trans Union

66.     On or about March 24, 2023, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff separately disputed the delinquent information regarding the Account with the Credit Bureau Defendants.[1]

67.     Plaintiff explained that delinquent information in relation to his Account with Comenity Bank was inaccurate as he had cancelled the Ring order and received confirmation from Kay Jewelers. Plaintiff also provided documentation as proof the order had been cancelled.

68.     Plaintiff requested that the Credit Bureau Defendants reinvestigate the disputed information, correct the reporting, and for each to send him a corrected copy of his credit report.

### Defendant Equifax's Unreasonable Dispute Reinvestigation

69.     Upon information and belief, Equifax failed to send Comenity Bank notice of Plaintiff's dispute, including but not limited to an automated credit dispute verification ("ACDV") pursuant to Plaintiff's March 24, 2023, dispute to Equifax.

12

70. Alternatively, Equifax merely parroted the information reported by Comenity Bank,

71. Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute and failed to respond to Plaintiff's dispute.

72. Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered March 24, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

73. Upon information and belief, Trans Union failed to send Comenity Bank notice of Plaintiff's dispute, including but not limited to an ACDV pursuant to Plaintiff's March 24, 2023, dispute to Trans Union.

74. Alternatively, Trans Union merely parroted the information reported by Comenity Bank,

75. Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute and failed to respond to Plaintiff's dispute.

76. Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered March 24, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

13

**Plaintiff's First Dispute to Defendant Experian**

77.     On or about May 8, 2023, Plaintiff disputed the delinquent information regarding the Account with the Defendant Experian.

78.     Plaintiff explained that delinquent information in relation to the Account with Comenity Bank was inaccurate as he had cancelled the Ring order and received confirmation from Kay Jewelers. Plaintiff also provided documentation as proof the order had been cancelled.

79.     Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and to send him a corrected copy of his credit report.

**Defendant Equifax and Defendant Trans Union Continue Reporting Inaccurate Information on Plaintiff's Credit Reports**

80.     On or about May 16, 2023, Plaintiff requested his consumer files from Defendant Equifax and Defendant Trans Union on annualcreditreport.com, to determine whether the Credit Bureau Defendant's corrected the inaccurate reporting.

81.     Upon reviewing his credit files, Plaintiff discovered that Defendant Equifax and Defendant Trans Union were still reporting the Account as delinquent.

82.     Specifically, Defendant Equifax failed to correct or delete the owed and past due balances regarding the Account. Worse yet, Defendant Equifax updated the status to over 120 days past due, whereas before the dispute it was reported as "not more than two payments past due".

83.     Similarly, Defendant Trans Union failed to correct or delete the owed and past due balances regarding the Account and updated the status to over 120 days past due, whereas before the dispute it was reported as "30 days late".

**Defendant Experian's First Unreasonable Dispute Reinvestigation**

84.     On or about May 24, 2023, Defendant Experian responded to Plaintiff's May 8, 2023, dispute letter.

85.     Defendant Experian's dispute response indicated that it did not take any action regarding Plaintiff' dispute, because it questioned the authenticity of Plaintiff's dispute letter.

86.     Upon information and belief, Experian failed to send Comenity Bank notice of Plaintiff's dispute, including but not limited to an ACDV  pursuant to Plaintiff's May 8, 2023, dispute to Experian.

87.     Upon information and belief, Defendant Experian failed to adequately review all the information provided to it by Plaintiff in support of Plaintiff's dispute.

88.     Thereafter, Defendant Experian failed to correct or delete the disputed information from Plaintiff's credit file.

89.     Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered May 8, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's Second Dispute to Defendant Experian**

90.     On or about July 7, 2023, Plaintiff disputed the delinquent information regarding the Account with Defendant Experian for a second time.

91.     In his letter, Plaintiff referenced his May 8, 2023, dispute, and that Experian ignored it because it questioned the authenticity. He also reexplained that the delinquent information in relation to the Account was inaccurate as he had cancelled the Ring order and received confirmation from Kay Jewelers. Plaintiff also provided documentation as proof the order had been cancelled.

92.     Plaintiff requested that Experian reinvestigate the disputed information, correct the reporting, and to send him a corrected copy of his credit report.

93.     Plaintiff has yet to receive a dispute response from Defendant Experian.

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

94.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

95.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

96.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

97.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

98.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

99.     Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

100.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

101.     These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

102.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

103.    The data furnishers, like Comenity Bank, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

104.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### 105.    Plaintiff Applies for a Credit Limit Increase with Capital One

106.    On or about July 11, 2023, Plaintiff requested a credit limit increase for his Capital One account.

107.    Plaintiff hoped to obtain an increased credit limit to purchase a home during summer of 2023 rather than continuing to rent.

### Capital One Denies Plaintiff's Application

108.    On or about July 12, 2023, Capital One denied Plaintiff's request for the credit limit increase as direct result of delinquent information reported by Defendants.

109.    Capital One specifically denied Plaintiff's application for a credit limit increase because the Credit Bureau Defendants reported a recent credit delinquency.

110.    Upon information and belief, the recent credit delinquency pertained to the Credit Bureau Defendants continued reporting that Plaintiff was delinquent in relation to the Comenity Account.

111.    As a result of the inaccurate delinquent information, and despite Plaintiff's efforts to fix the inaccurate information, the Defendants made it practically impossible for Plaintiff to continue to obtain credit.

112.    Despite Plaintiff's hard work to establish strong financial footing, Plaintiff fears he is unable to qualify for extensions of credit based on the inaccurately reported delinquent information by Defendants.

113.    Upon information and belief, due to Defendants' unreasonable procedures, Plaintiff's credit score dropped nearly 100 points, which ruined his plans of buying a house. Instead, he was forced to continue leasing.

114.    Plaintiff fears he is unable to qualify for a mortgage on the basis of the inaccurately reported delinquent information by Defendants. Defendants' reporting has shattered Plaintiff's dream of buying a house by summer 2023.

115.    Plaintiff has therefore refrained from applying for a mortgage due to his fear of being denied.

116.    Plaintiff is effectively chilled from submitting any mortgage applications for fear that he will be denied and that his score will continue to suffer.

117.    These circumstances have caused significant emotional distress to Plaintiff and have disrupted Plaintiff's day to day life and sleep schedule. It has also caused relational strain between Plaintiff and his fiancé, as they had discussed purchasing a home together.

18

118.    Plaintiff has also been afraid to apply for certain jobs due to the inaccurate delinquent information reported by Defendants.

119.    Plaintiff works in the financial industry and is interested in working as a Financial Advisor. He reasonably fears, however, that during his job application processes, a potential employer will ask to review his credit. He further fears that his potential employer will not be inclined to hire him after reviewing his credit report, because the inaccurate information caused a significant drop in his credit score, and as a Financial Advisor, Plaintiff should have good credit.

120.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

121.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

122.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher, like Comenity Bank here, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only

19

superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

123.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

124.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

125.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

126.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

20

127.     On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

128.     Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

129.     Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

130.     Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

131.     Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

132.     As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

133.     Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an

amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

134.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

135.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

136.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id.*

137.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

138.    On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete disputed delinquent information in relation to Plaintiff's Account in his credit file that is patently inaccurate, misleading, and highly damaging to his, namely, the owed and past due notation reported about his Account.

22

139.    In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

140.    In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

141.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

142.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

143.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

144.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be

determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

145.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

Determining that Defendants negligently and/or willfully violated the FCRA;

Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

Granting further relief, in law or equity, as this Court may deem appropriate and just.

**DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

Date: August 3, 2023                    *s/ Christopher Kim Thompson*
                                        Christopher Kim Thompson Bar # 015895
                                        Thompson Law
                                        4525 Harding Pike, Suite 203
                                        Nashville, TN 37205
                                        Telephone: 615-832-2335
                                        Email: kim@thompsonslawoffice.com
                                        *Attorneys for Plaintiff, Adam Hedrick*